UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

JOHN DORN,

                Petitioner,                    Case No. 1:12-cv-872

v.                                     Honorable Gordon J. Quist

CINDI CURTIN,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in the Kalamazoo County Circuit Court, Petitioner was convicted of assault with intent to commit great bodily harm less than murder (GBH), MICH. COMP. LAWS § 750.84, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. On May 11, 1998, Petitioner was sentenced as a fourth felony offender, MICH. COMP. LAWS § 769.12, to consecutive prison terms of 15 to 30 years on the GBH conviction and 2 years on the felony-firearm conviction. In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

    I.      John Dorn was deprived of his constitutional right to the effective assistance of counsel.

    II.     John Dorn was deprived of his constitutional right to be sentenced based upon accurate information and constitutionally permissible sentencing considerations.

    III.    John Dorn's constitutional right to a speedy appeal was violated by the 12-year delay in affording him an appeal of right.

(Pet. at 31, 37, 40, docket #1.) Respondent has filed an answer to the petition (docket #6) stating that the grounds should be denied because they are procedurally defaulted, noncognizable or without merit. Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit, procedurally barred or noncognizable. Accordingly, I recommend that the petition be denied.

## Procedural History

### A. Trial Court Proceedings

The state prosecution arose from an incident in which Petitioner shot a man in the leg. Petitioner was charged with assault with intent to murder, MICH. COMP. LAWS § 750.83, being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and felony firearm, MICH. COMP. LAWS § 750.227b. Following a preliminary examination on October 29, 1997, Petitioner was bound over on all charges. (Prelim. Hr'g Tr. at 76-77, docket #24.) A supplemental information was filed charging petitioner as a habitual offender, fourth offense. (See Cir. Ct. Register of Actions at 2, docket #8.) Petitioner was tried before a jury beginning April 7, 1998, and concluding on April 10, 1998.[1]

On the opening day of trial, the prosecutor dismissed the felon-in-possession charge. (Tr. I at 5-6.) In addition, the parties stipulated that Petitioner's HIV status was irrelevant to the case, and the court ordered that the witnesses be cautioned not to inject the issue into the case. (Id. at 4-5.) Finally, the court entered a sequestration order excluding witnesses from the courtroom until after they testified and directing them not to discuss their testimony. (Id. at 6-7.) The court

---

[1]Trial transcripts hereafter will be designated as follows:
Tuesday, April 7, 1998: "Tr. I at ___";
Wednesday, April 8, 1998: "Tr. II at ___";
Thursday, April 9, 1998: "Tr. III at ___";
Friday, April 10, 1998: "Tr. IV at ___."

expressly inquired whether Petitioner's partner, Steve Hegler, would be testifying, as Hegler was present in the courtroom.  Defense counsel stated, "He's not a witness, Your Honor."  (*Id.* at 11.)

Walter Anderson testified that he did not know Petitioner until a week or two before he was shot on October 20, 1997, though Anderson knew of Petitioner from his cousin, Steven Hegler, who had been in a relationship with Petitioner for nine years.  (Tr. II at 91-92.)  On the evening he met Petitioner, Anderson had gone to the Zoo Bar in Portage, Michigan.  (*Id.* at 93.)  At about 3:00 a.m., after the bar had closed, Anderson walked to Bronson Park.  Although he originally was accompanied by friends, he lost sight of them and walked on alone, stopping at a gas station to pick up a pack of cigarettes and a Sprite.  (*Id.* at 93, 95-96.)  At the park, Anderson met some other friends and then decided to leave, telling the men who were there to let his other friends know that he had walked home.  Anderson walked as far as Church and Ransom, when Petitioner rode up to Anderson on a bicycle, expressing interest in hooking up, or having sex with, Anderson.  (*Id.* at 96-97.)  Anderson and Petitioner went to Anderson's house and had sex.  (*Id.* at 97-98.)  Two days after his encounter with Petitioner, Anderson saw Hegler at the Rexal and, feeling guilty, told him what had happened.  (*Id.*)  Hegler was upset with Petitioner and Anderson.  (*Id.* at 98.)  Anderson felt bad because Hegler had recently had been hurt in an altercation with other people and was going through a bad time.  (*Id.*)  After hearing the news, Hegler left the home in which he had been living with Petitioner and went to stay with a cousin.  (*Id.* at 100.)

On the night of October 19-20, 1997, Anderson went to the Zoo Bar, as he always did on Sunday nights.  (*Id.* at 100.)  Also as he normally did, Anderson left the Zoo Bar and walked to Bronson Park.  (*Id.* at 101.)  During the course of the evening, Anderson had a few drinks, but he did not feel intoxicated at the time he walked toward Bronson Park.  (*Id.* at 102.)  Anderson was

- 3 -

accompanied by Frank McCone,[2] Lamar (Jamaun) Harkness and Lindsay Bates.  (*Id.* at 102-03.)

McCone and Bates took a detour to McCone's house to get something to eat.  (*Id.* at 103.)  Harkness

and Anderson walked on to Bronson Park, where they saw a few friends.  (*Id.*)  Petitioner came up

to Anderson and told him that he wanted to talk about why Anderson had told Hegler that they had

"messed around."  (*Id.* at 104.)  When Petitioner initially spoke to Anderson, Petitioner's voice was

a bit angry.  As they began speaking, Petitioner began jabbing his finger into Anderson's chest and

demanding an explanation.  (*Id.*)  Anderson pushed Petitioner's hand away and told Petitioner that,

if he wished to talk, he didn't need to put his hands on Anderson; Anderson was willing to talk.  (*Id.*

at 105.)  Petitioner again pointed his finger against Anderson's chest, and Anderson stepped back.

(*Id.* at 177.)  Anderson's friend, Willie McCree, got between the two and said, "John, get out of his

face. . . . You're not gonna do nothing to him.  If you put your hands on him I'm gonna f--- you up."

(*Id.* at 106.)  McCree and Petitioner then had a verbal confrontation.  After awhile, Anderson stated

that, if Petitioner wished to talk, Anderson was willing to talk to him.  (*Id.* at 107.)  McCree walked

back to the other friends.  (*Id.* at 117.)  Anderson then saw Petitioner pick up a black gun from the

grass, which he placed behind his back, in his belt loop.  (*Id.* at 117-18.)  Anderson did not leave at

that time because he was afraid that Petitioner might use the gun on him.  (*Id.* at 119.)

Petitioner pulled Anderson's shoulder close, and the two walked the distance of about

four parking meters from the corner, where they began to talk.  (*Id.* at 108.)  The discussion again

became heated, with Petitioner demanding to know why Anderson had told Hegler about the affair.

(*Id.* at 116.)  Anderson made a response and then started to walk away.  He saw his friends, including

---

[2]Although the transcript refers to the individual as "Frank Malcolm," all subsequent briefing in both the state courts and this Court refers to the man as "Frank McCone."  For clarity, the R&R will hereafter use "McCone."

McCree, getting into their cars and leaving, but Lamar Harkness was still there, and Anderson walked over toward him.  (*Id.* at 120-21.)  Anderson told Harkness that he was ready to leave and suggested that they go.  Harkness asked what was going on, but Anderson just said, "Let's go."  (*Id.* at 121.)  They walked from the First Congregational Church to the corner of Park and Academy, where they made a right.  They headed north for seven or eight steps, after which Petitioner grabbed Anderson by the collar and put something metal and hard to the back of Anderson's head.  (*Id.* at 121-22.)  Anderson told Petitioner to take the gun off of his head.  Petitioner then said, "[S]hut up, bitch, before I blow your brains out."  (*Id.* at 122.)  Petitioner moved Anderson backwards into the middle of Park and Academy Streets.  Petitioner then walked around to the front of Anderson, and put the gun against Anderson's forehead.  (*Id.* at 123.)  Petitioner stated, "I'm gonna teach you about breaking up . . . other people's happy homes.  (*Id.* at 125.)  Petitioner kept his arm straight out, with the gun pointed upward into Anderson's face.  (*Id.*)  Anderson took a few steps back, and Petitioner mumbled something, after which Anderson saw him become more hostile.  (*Id.* at 126.)  Petitioner repeated, "I'm gonna teach you about breaking up my happy home."  (*Id.*)  Petitioner dropped the gun somewhat, pointing below Anderson's waist.  (*Id.* at 126.)  Petitioner fired two shots.  (*Id.* at 127.)

Anderson froze at first, not feeling anything.  (*Id.* at 128.)  After a few seconds, still not realizing that he had been shot, Anderson had the impulse to attack Petitioner, thinking, "[I]f you don't attack him he gonna shoot you."  (*Id.* at 129.)  Anderson lunged toward Petitioner and grabbed Petitioner around the neck with his right hand.  He knocked Petitioner off balance, and Petitioner's arm came up.  (*Id.* at 130.)  Anderson grabbed Petitioner's right wrist with his left hand and struggled for the gun.  (*Id.* at 130-31.)  He held Petitioner's arm up, pushing it away from pointing

at his face.  (*Id.* at 132-33.)  Petitioner continued to struggle, and four more shots were discharged into the air.  (*Id.* at 133-34.)  Petitioner then jerked away a few feet, before attempting to fire two more shots at Anderson's chest.  (*Id.* at 134-35.)  Although the trigger was pulled twice, it only clicked, because there were no more bullets.  (*Id.* at 137.)  Anderson said, "What you gonna do now, bitch?  You outa bullets."  (*Id.* at 138.)  Petitioner responded, "You need to go home you little bitch." (*Id.*)  Anderson then looked down and saw that he had been shot in the lower right leg.  (*Id.* at 138.) Anderson turned and walked toward Harkness.  (*Id.* at 139.)  Harkness asked what was going on, what had happened.  Anderson said, "Jamaun, . . . Hold me up. . . . I can't walk. . . . I've been shot. (*Id.*)  Harkness had placed an arm around Anderson, but thought Anderson was not serious, until Anderson turned his right leg to the side, showing the bloody hole in his pants leg.  (*Id.* at 140.) Harkness and Anderson walked to the Amoco Gas Station.  (*Id.*)

Anderson testified that he smelled alcohol on Petitioner's breath and saw the liquor bottle inside Petitioner's coat.  (*Id.* at 141.)  When he saw the gun, Anderson believed it was a .38 caliber revolver, with a spin barrel.  (*Id.* at 143.)  Anderson identified the handgun as People's Exhibit #12.  (*Id.* at 144.)

The ambulance picked Anderson up at the Amoco station and brought him to Bronson Methodist Hospital emergency room.  (*Id.* at 145.)  The bullet entered from the inside of his right calf, just below the knee, and exited the lower, outside part of his right leg.  (*Id.* at 145-46.) Anderson identified photographs of the injury, as well as the clothing he wore on that evening.  (*Id.* at 147-50, 154-55.)  Anderson's wound was flushed and bandaged before he was released by the hospital.  He suffered only soreness from the wound.  (*Id.* at 156.) Defense counsel impeached Anderson with contradictions between his trial testimony and his statements as recorded in the police

- 6 -

reports. (*Id.* at 163-70.) Anderson testified that Harkness was sitting on the church stairs, kitty-corner across the street. (*Id.* at 174.)

Dr. Lisa Wagner Rogers was qualified as an expert in emergency medicine. (*Id.* at 183-85.) She testified that, in the early morning hours of October 20, 1997, she saw Mr. Anderson, who had been brought to the emergency room by ambulance because of a gunshot wound. (*Id.* at 186.) Her examination confirmed that it was a gunshot wound. Anderson's leg was x-rayed, his wound was irrigated and debrided, and he was administered antibiotics and pain medication. (*Id.* at 186.) Anderson had no broken bones, and no bullet was found. Dr. Rogers testified that Anderson was alert, pleasant and cooperative, though he was upset by the shooting. (*Id.*) Anderson told Dr. Rogers that the gunshot wound was inflicted by someone known to him, who had attempted to shoot him several times and was successful with one shot. (*Id.* at 187.) Dr. Rogers testified that the bullet entered on the medial, or inside, aspect of the leg and exited on the outer side of the leg, based on the report of events given by Anderson. (*Id.* at 188.) After it was cleaned, Anderson's wound was bandaged, and he was sent home. (*Id.* at 189.)

Anthony Gardner testified that he was on the corner of North Rose Street and Academy Street, when he heard a couple of men arguing. He saw some pushing and shoving between them, and then he heard a total of four to five gunshots. (*Id.* at 193-94, 203.) The gunshots came from the corner of Academy Street and Park Street. (*Id.* at 195.) Gardner could not see the faces of the people, nor could he tell their races. (*Id.* at 194.) Gardner first saw one person, then two people. When he heard arguing, a third person came out. After the shots, two people went down Park Street and the other person crossed the street and got into a white car, possibly a Trans Am, a Grand Prix, a Grand Am or a Bonneville. (*Id.* at 196.) Gardner testified that he had met Walter

Anderson and talked with him once or twice. He had seen Petitioner before. (*Id.* at 197.) On October 20, 1997, he was not there to meet either man and had not been involved with them that day. (*Id.*) Gardner spoke with the police that day and told them he had heard four or five shots, but the police reported him saying six shots. (*Id.* at 200.) The shots sounded like they were from a small gun, because they were not loud, sounding like, "Pop. Pop. Pop. Pop. Pop." (*Id.* at 202.)

Lamar Jamaun Harkness testified that Walter Anderson was a close friend of his. (*Id.* at 206.) He knew Petitioner, who was a friend of a friend. (*Id.*) On the night of Sunday, October 19-20, 1997, Harkness went to the Zoo Bar, as he often did on Sunday nights. He usually went to the bar with Frank or Walter or Jason. (*Id.* at 207.) He left the bar with Walter Anderson, Frank, and Walter's cousin, whose name he did not know. On the way to Bronson Park, they split up. Harkness went to the Park Street side of Bronson Park, near the First Congregational Church. (*Id.* at 208.) When he reached the park, he saw a number of people he knew, many of whom had just left the Zoo Bar. (*Id.* at 209-10.) He saw both Petitioner and Mr. McCree. (*Id.* at 209.) At some point, Petitioner and Anderson started talking, and it led to an argument. (*Id.* at 209-10.) The two were standing at the edge of Bronson Park, across the street from where Harkness was standing. Both men sounded angry. Harkness approached the men and tried to get Anderson to leave, but Anderson did not want to go. (*Id.* at 211.) Petitioner had Anderson's arm and would not let him go. (*Id.* at 211-12.) Harkness told Petitioner to let Anderson go. Petitioner kept reaching behind his back, but eventually let go of Anderson. Petitioner then pulled a gun from behind his back and aimed it toward Anderson's face. (*Id.* at 212.) Anderson knocked Petitioner's hand up to get the gun away from his face, and the two struggled. (*Id.* at 112-13.) Petitioner shot twice into the air and then aimed it toward Anderson's foot or the ground and started shooting. (*Id.* at 213.) Anderson at one

- 8 -

point grabbed Petitioner's arm, attempting to point the gun into the air. (*Id.* at 213-15, 218.) After the shots rang out, Harkness heard the gun clicking an unknown number of times as Petitioner pulled the trigger, and he stated that the gun was pointed at the ground when he heard the clicks. (*Id.* at 218.) According to Harkness, he was standing only between 10 and 20 feet away from the incident, near the corner of Park and Academy. (*Id.* at 219-20.) Petitioner and Anderson were on the edge of the intersection. (*Id.* at 219.) Harkness testified that he was shocked about what happened and stood there for a minute. (*Id.* at 220.) Petitioner told Anderson that he should leave and that he was lucky that Harkness was there. (*Id.* at 221.) Harkness then suggested to Anderson that they leave. After they walked halfway down the street, Anderson told Harkness that he had been shot, at which point Harkness saw that Anderson's leg was bleeding. (*Id.* at 220.) Anderson was crying. (*Id.* at 221.) Harkness acknowledged that he had consumed two beers that evening. (*Id.* at 215.) He indicated that he had not had any contact with Petitioner or Petitioner's friends since that night. (*Id.* at 216.) Harkness also testified that he talked with a police officer while they were at the Amoco station, but he never wrote a statement. (*Id.* at 216, 223.)

Willie James McCree testified that he had known Anderson, who lived lived around the corner from his house, for some years. He also knew Petitioner through Steve Hegler, who was a friend of McCree's. (*Id.* at 229.) In the early morning hours of October 20, 1997, McCree was sitting on a picnic table in Bronson Park, talking, he believed, to his friend Frank. (*Id.* at 230.) He had come to the park after the Zoo Bar closed. (*Id.* at 233.) After McCree had been at the park for five or ten minutes, Petitioner walked up, looking for Anderson. (*Id.* at 230-31.) McCree continued to talk with Petitioner. (*Id.* at 231.) Petitioner stated that he wanted Anderson "to answer to him." (*Id.* at 232.) McCree was concerned that Petitioner was going to try to fight Anderson. (*Id.* at 232,

236.)  Five or ten minutes later, Anderson arrived.  (*Id.* at 233.)  Petitioner and Anderson began to talk, standing next to the picnic table.  They then moved down to the corner of Park and Academy, where they continued to talk, though McCree could not hear what was being said.  (*Id.* at 233-34.) They were still there when McCree got a ride home with Donald Cain.  (*Id.* at 235.)  McCree did not hear any shots fired.  Before McCree left the park, he hollered down to the corner, asking if Anderson was alright.  Anderson said he was fine.  (*Id.*)

Lenell Anthony Mayfield testified that, on October 20, 1997, he was a roommate with Petitioner and Steve Hegler at 823 Wheaten.  (*Id.* at 243-45.)  At about midnight or 1:00 a.m., after Mayfield arrived home from Ann Arbor, Petitioner came into his room.  (*Id.* at 245-26, 253.) Petitioner asked Mayfield for a ride. Mayfield saw what looked like a brown and black butt of a gun in Petitioner's possession.  (*Id.* at 246.)  Mayfield refused to drive Petitioner, as he was not sure what Petitioner planned to do with the gun.  (*Id.* at 245-46.)  Petitioner looked like he had been drinking and he seemed preoccupied.  (*Id.* at 247.)  Mayfield heard Petitioner come in later, just as Mayfield was falling asleep, but he did not see him because his door was closed.  (*Id.* at 247, 250.)  Five minutes after Petitioner came in, the police beat on the door.  (*Id.* at 247-48.)  When the police arrived, in addition to Lenell Mayfield, the apartment included Lonnie Mayfield (Lenell's brother), Steve Hegler, and Petitioner.  (*Id.* at 248.)  As soon as Petitioner answered the door, the police whisked him down the stairs.  The police then returned to the apartment and got the Mayfields and Steve Hegler outside, where they were kept on the lawn dressed only in their underwear.  (*Id.*)  When the police went into the apartment to search it, the residents went inside with them.  (*Id.* at 249.) Mayfield testified that he told the police officer who interviewed him that he had seen what looked like a gun at Petitioner's waist.  (*Id.* at 251.)  Mayfield admitted that he had been drinking and

smoking marijuana from about 6:00 p.m. or 7:00 p.m. that night. (*Id.* at 252-53.) He testified, however, that it had worn off by the time he got home and it did not affect his memory. (*Id.* at 254.)

Melvin Leroy Emmans testified that he had known Petitioner for ten years because of coming to the Zoo Bar. (*Id.* at 255-56.) Emmans did not know Walter Anderson. (*Id.* at 256.) Emmans went to the Zoo Bar on October 19, 1997. (*Id.* at 256.) After leaving the Zoo Bar, he went to Bronson Park, as he sometimes did. (*Id.* at 257.) He arrived at the park shortly after 2:00 a.m., the time the bar closed. (*Id.*) He drove to the park alone in a 1991 white Lumina, and he parked on Academy, closer to Park Street than Rose Street. (*Id.* at 258.) Emmans sat in his car for a few minutes. He then saw Petitioner talking to another man at Bronson Park. (*Id.* at 259.) He could not hear the conversation, though he had his driver's side window open. (*Id.* at 260.) The conversation did not appear friendly, as the two people were face-to-face, and standing too close together for friendly conversation. (*Id.* at 261.) Emmans got out of his car to find out what was going on. (*Id.*) Emmans walked up to the two men and said hello. Petitioner acknowledged him, but Emmans realized the conversation was not friendly. He got back into his car. (*Id.* at 262.) While he was back in his car, Emmans saw Petitioner pull something out of his boot and put it in the back of his pants. The item looked like a weapon, and Emmans first thought it was a knife. (*Id.* at 263.) At that point, the argument moved further towards the park, and another man arrived. (*Id.* at 263.) The third man, who was black, was engaged in the conversation and trying to keep the other two calm. (*Id.* at 264.) Emmans did not recall what happened to the third man, but he saw the other two move toward the curb at Academy and Park. (*Id.* at 264.) He saw a confrontation, and saw the other man hold Petitioner's arm to keep it away from him. From his position, however, he could not tell exactly what was going on. (*Id.* at 265.) After a few minutes, he got out of his car again, so that the

windshield would not obstruct his view.  (*Id.* at 265.)  Emmans opened his trunk, because he was anticipating a possible physical confrontation and was looking for something that might help.  (*Id.* at 265-66.)  He heard shots that sounded like a pop gun or starter gun.  He looked to where the sound was coming from, which was where the two men were standing, facing one another.  (*Id.* at 266.)  Emmans saw Petitioner's hand raise up as if Petitioner was pointing a gun at the other man's head, and he saw a gun.  Emmans testified that he heard a total of three or four shots.  (*Id.* at 267.)  He knew that one shot went into the air, one went off the ground and he did not know where the other went.  The shot that went into the air was the first shot, which happened after the other person had placed his hand on Petitioner's arm.  He then saw a struggle and heard another shot, when the gun was pointing toward the ground in the direction of the other person.  (*Id.* at 269.)  Emmans saw the gun pointed squarely at the other person, but he was not paying close attention because he had become concerned that it was time to leave.  He started his car and backed it up.  At that point, Petitioner turned and walked directly to Emmans' car.  (*Id.* at 271.)  Emmans did not signal to Petitioner to get him to come over, but he had spoken to Petitioner when he first arrived and Petitioner knew he was there.  (*Id.* at 271-72.)

When Petitioner got into the car, he was nonchalant.  Emmans asked Petitioner "if he was done screwing around."  (*Id.* at 272.)  Petitioner had a gun in the car, and Emmans drove Petitioner back to Petitioner's apartment.  Emmans heard Petitioner "messing with the bullets," meaning that he heard bullets falling out of the gun and onto the floor.  (*Id.*)  Emmans told Petitioner not to leave bullets in his car.  (*Id.* at 272-73.)  Emmans turned on the map light in his car so that Petitioner could see what he was doing.  (*Id.* at 273.)  Following Petitioner's directions, Emmans drove Petitioner to his apartment.  Petitioner invited Emmans up to drink some beer with him, and

Emmans agreed.  (*Id.* at 273-74.)  As they walked up the steps to Petitioner's apartment, Petitioner either fumbled with the key or didn't have a key, and he had to knock to be let in.  (*Id.* at 274.) While Petitioner was trying to get in, he handed the gun to Emmans.  Emmans described the gun as fairly small and black, and he identified People's Exhibit 12 as appearing to be the gun he saw on October 20, 1997.  (*Id.* at 274-75.)  When Emmans arrived at the apartment, there were several people there, only one of whom he knew, Steve Hegler.  (*Id.* at 275-76.)  Petitioner showed Emmans his photography equipment and some pictures, and they talked for a few minutes and drank beer. (*Id.* at 276.)  Emmans last remembered seeing the gun placed on a bar stool in the living room.  (*Id.*) Petitioner left the room at some point, and Emmans went to the bathroom.  (*Id.* at 276-77.)  Emmans estimated that the police arrived 10 or 15 minutes after he arrived.  (*Id.* at 277.)  When the police arrived, Emmans was at the house, but not in the apartment.  (*Id.* at 278.)

Emmans acknowledged that he had been drinking on October 20, 1997, but he stated that he had only a couple of beers.  (*Id.* at 280.)  He testified that he allowed Petitioner to get into his car because he feared for his safety, having watched the incident and having concluded that Petitioner might be unreasonable and intoxicated.  (*Id.* at 287.)  Emmans also felt that, once Petitioner had walked to his car, he had little choice but to let him get in if he wanted to keep things calm.  (*Id.*)  He accepted Petitioner's invitation to come up for a drink for similar reasons. (*Id.* at 283.)  Emmans did not know whether the gun still held bullets after Petitioner got to the car.  (*Id.* at 288.)  While Emmans thought the gun was a starter pistol initially, he saw that it was a real gun when Petitioner handed it to him outside the apartment door.  (*Id.*)

Kalamazoo Public Safety Officer Jason Lee Colyer testified that he was near the intersection of St. John Street and West South Street next to Bronson Park about ten minutes before

- 13 -

the call reporting a shooting at Bronson Park on October 20, 1997.  (*Id.* at 293.)  After receiving the

call, Colyer concluded that the two men he was watching could be suspects, so he called for backup

and secured the two men at gunpoint.  (*Id.* at 295.)  After he and Officer Hoyt interviewed the men,

they were released, and Officer Colyer proceed to the intersection on Academy Street where the

shooting was reported to have occurred.  (*Id.* at 296.)  Colyer walked through the intersection and

Bronson Park, looking for evidence, such as cartridge brass or blood.  He found no blood or other

evidence.  (*Id.* at 297.)

Kalamazoo Public Safety Officer Jeff Vanderwiere testified that he was working in

the early morning hours of October 20, 1997.  (Tr. III at 6-7.)  He received a dispatch of a shooting

at the Amoco Station at 502 West Michigan.  Vanderwiere responded to that location and found

Walter Anderson, who had been shot in the right leg, and Lamar Jamaun Harkness.  Vandermiere

testified that Anderson was extremely frightened, crying, and in a tremendous amount of pain.  (*Id.*

at 7.)  Vandermiere had Anderson sit on the curb near the pay phone until the emergency medical

service could arrive.  Vandermiere saw a bloodstain on Anderson's pants, but the bleeding was fairly

controlled by that time.  Vandermiere nevertheless rendered first aid, pulling up Anderson's pant leg

and applying pressure with a medical kit.  (*Id.* at 8.)  He interviewed Anderson briefly, only to obtain

some details regarding the suspect, but he did not conduct a detailed interview.  Anderson stated that

Petitioner had shot him and that the gun had been fired five or six times and then dry-fired after that.

(*Id.* at 18.)  When other officers arrived, Vandermiere directed the officers somewhere else, based

on the information Anderson had provided.  (*Id.* at 10, 18.)  He stayed with Anderson until the fire

truck and ambulance arrived to take over care.  Vandermiere then concentrated his interview on

Harkness.  (*Id.* at 9-10.)  Harkness was laid back and cautious, providing information, but not

volunteering it. (*Id.* at 10.) The interview was brief, lasting not more than two or three minutes. Harkness did not travel in the ambulance with Anderson, and Vandermiere did not know where he went after he was interviewed. (*Id.* at 11.)

After the ambulance had transported Anderson to the hospital, Vandermiere went to the site of the shooting, the northwest corner of Bronson Park at Park and Academy, based on information he had gotten from Harkness and Anderson. He met Sergeant Loney, and they began to secure the scene and check for bullets and cartridge casings. Vandermiere testified that a semi-automatic weapon will eject the casings after the gun is fired, but a revolver retains the casings in the gun. (*Id.* at 12.) They started their search on the northwest corner, on the sidewalk, and continued approximately 100 feet east, down Academy, across the street, on the north side near the church area, and then kitty-corner on the northwest corner of Park and Academy. Because they did not know the direction in which the bullets were fired, they had little expectation of finding them. (*Id.* at 13.) They found no bullets or blood droplets. (*Id.* at 14.)

After completing the search of the area, Vandermiere went to Bronson Hospital to conduct a more in-depth interview with the victim. Anderson had calmed down some, but he was still emotional and alternately crying. (*Id.* at 15.) Vandermiere's interview of Anderson took about 15 minutes. (*Id.*) Vandermiere took some pants from Anderson and placed them into evidence. (*Id.* at 16.) He prepared the brown paper bag in which they would be stored, and hung it in the drying locker with the pants. (*Id.*) Once dry, the lab technician would place the pants in the bag prepared by Vandermiere. (*Id.* at 17.) Vandermiere observed one bullet hole in the pants. (*Id.*)

Kalamazoo Public Safety Officer Wayne Loney supervises two fire stations and five firefighters on the night shift for the Kalamazoo Department of Public Safety. (*Id.* at 24.) On

October 20, 1997, Loney received a dispatch about a shooting, first at the Amoco station at Westnedge and Michigan, and then changed to Bronson Park.  (*Id.* at 25.)  Loney went to Bronson Park in response to Officer Colyer's call.  Loney spoke with Anthony Gardner, and he called an officer to interview Gardner.  (*Id.* at 26.)  With other officers, he narrowed down the scene of the shooting and searched north on Park Street and West on Academy Street for bullets, cartridge cases, scars in the cement and blood stains.  (*Id.* at 27-28.)  They found nothing.  (*Id.* at 28.)  Based on his 25 years as a police officer, Loney did not expect to find bullets.  He also had witnessed other crimes in which blood had not escaped onto the pavement, despite an injury.  (*Id.* at 31.)  In addition, if a revolver was used, the casings would have remained in the gun.  (*Id.* at 32.)  Officer Peter J. Hoyt testified that he also reported to the scene and participated in the search, finding nothing.  (*Id.* at 35-38.)

Kalamazoo Officer Percy Malcolm Jenkins testified that he assisted with the investigation of the October 20, 1997 shooting.  He went to 823 Wheaten and helped other officers to take Petitioner and two or three other suspects out of the upstairs apartment, patted them down, and laid them on the ground with their arms and legs spread out.  (*Id.* at 40-41.)  Jenkins patted down Petitioner, and he subsequently transported him and lodged him in the jail.  (*Id.* at 43.)  Jenkins testified that Petitioner had no trouble walking or balancing.  (*Id.*)  Mark Laster also responded to 823 Wheaten, where Petitioner resided.  (*Id.* at 46.)  Laster knocked on the door, and Petitioner eventually answered.  (*Id.* at 48-49.)  When he stepped out on the porch, Petitioner was arrested.  (*Id.* at 49.)  The other occupants were taken outside, in order to secure the apartment.  (*Id.* at 50-51.)  Two officers, Kevin Oliver and Jeff Malcolm, were allowed to go back into the apartment.  (*Id.* at

51-52.)  Consistent testimony was given by Sergeant James Mallery, who arrived with Sergeant

Laster.  (*Id.* at 55-59.)

Officer Kevin Oliver assisted in the execution of a search warrant on the apartment

at 823 Wheaten Street on October 20, 1997.  (*Id.* at 64.)  Oliver remained with the individuals

present at the time of the search warrant: Steve Hegler, Lenell Mayfield, and Lonnie Mayfield.  (*Id.*

at 65.)  He used bolt cutters on a box located in the apartment, to which none of the three occupants

knew the combination.  He found a number of items, including a box of .32-caliber bullets.  (*Id.* at

66-67.)

Kalamazoo Police Detective Kevin Merlo testified that he was called to investigate

the Bronson Park shooting at about 3:30 a.m. on October 20, 1997.  (*Id.* at  69.)  He then went to 823

Wheaten Street, Apartment No. 2.  He read the search warrant to Steve Hegler and Lonnie and Lenell

Mayfield, who were in the apartment, and then he and the officers conducted a search.  (*Id.* at 70-71.)

He found a Smith & Wesson .32-caliber revolver inside the stove.  (*Id.* at 72.)  No spent casings or

live rounds were in the revolver.  (*Id.* at 75.)  In the bedroom adjacent to the kitchen, Merlo found

a Consumers Power bill in Petitioner's name, listing the Wheaten Street address.  (*Id.* at 76.)  In the

hallway, officers found a locked tool box, which Officer Oliver cut off because no one had the

combination.  (*Id.* at 76-77.)  The box contained a box of Remington .32-caliber bullets, with 20 of

the 50 bullets missing.  (*Id.* at 77-78, 95-96.)  In the living room, officers found a blue nylon pouch

sitting on a bar stool ; the pouch contained Petitioner's identification and 13 live rounds.  (*Id.* at 79.)

Merlo met with Petitioner at the Kalamazoo jail a bit after 6:00 p.m.  (*Id.* at 88.)  He advised

Petitioner of his *Miranda* rights, and Petitioner agreed to talk with him.  (*Id.* at 89-90.)  Petitioner

told Merlo that he did not intend to kill Walter Anderson.  (*Id.* at 90.)  Petitioner asked Merlo if he

had conducted a search of his home and found a gun.  (*Id.* at 90-91.)  Merlo told him he had found

the gun in the stove.  Petitioner stated, "Oh, man," and he put his head down on the table.  Petitioner

also asked about witnesses.  (*Id.* at 91.)  Petitioner again stated that he did not intend to kill

Anderson, and he claimed that he was intoxicated at the time of the incident.  (*Id.*)  Merlo had no

further conversation with Petitioner.  (*Id.* at 92.)  Merlo also participated in the search of a car

possessed by Melvin Emmans that was parked in the driveway next to 823 Wheaten Street.  (*Id.* at

92-93.)  Emmans consented to the search.  (*Id.* at 93.)  Officer Malcolm searched the car but found

nothing.  (*Id.*)  Merlo also interviewed Willie McCree and Walter Anderson.  He spoke with

Anderson three days after the incident.  Anderson was injured and limping, and he used crutches.

(*Id.* at 94.)  On cross-examination, Merlo acknowledged that a partial latent print taken from the

handgun was not matched to Petitioner's fingerprints.  (*Id.* at 98.)

        Kalamazoo Police mobile lab technician Tracy Cochran testified that he processed

the .32-caliber Smith & Wesson for fingerprints.  Using cyanoacrylate fuming, he found a partial

fingerprint right behind where the barrel lifts up and the cylinder opens.  (*Id.* at 112-13.)  He lifted

the print so that Specialist Apelgren could perform a print comparison.  (*Id.* at 114.)  Brett

Appelgren, the director of the Kalamazoo crime lab, was qualified as an expert in fingerprint

analysis.  (*Id.* at 116-18.)  The print was a poor quality, chance impression.  Apelgren indicated that,

because fingerprints are very environmentally degradable, it is common not to find prints on hard

surfaces like a gun.  (*Id.* at 120-21.)  Apelgren testified that the recovered partial print lacked

sufficient characteristics to make a positive identification or to link it to any one individual.  (*Id.* at

120.)

Petitioner testified in his own behalf.  Petitioner arrived at Bronson Park at about 2:15 a.m. on October 20, 1997.  (*Id.* at 127.)  He initially had a conversation with Willie McCree.  (*Id.* at 128.)  Petitioner then saw Walter Anderson about 10 minutes after he arrived.  (*Id.* at 127.)  Anderson was standing near the end of the park in the vicinity of Academy and Park Streets, across the street from Petitioner.  (*Id.* at 128.)  Anderson beckoned to Petitioner, and Petitioner went over to him.  (*Id.* at 129.)  Petitioner testified that he had a gun with him that night because shortly before the incident he had been mugged by four people and about two weeks before the incident his companion Steve Hegler had been stabbed in the head and had his arm broken by three assailants.  (*Id.* at 129.)  Petitioner acknowledged that he did not have a permit to carry the gun and that the gun belonged to someone in Hegler's family.  (*Id.* at 130.)  Petitioner took possession of the gun on the night of Sunday, October 19, 1997.  (*Id.*)  He carried the gun in the waist of his pants.  When he walked up to Anderson, Petitioner said, "What's up?"  (*Id.* at 131.)  Anderson responded, "No, you tell me what's up."  (*Id.*)  The two began to argue over things, including the fact that Petitioner's sexual contact with Anderson had disturbed Petitioner's relationship with his partner.  (*Id.* at 131.)  The argument became increasingly heated and included name-calling and finger-pointing.  (*Id.* at 131-32.)  During the course of the argument, the two stepped off the grass and moved to the corner.  (*Id.* at 132-33.)  The gun slipped from Petitioner's waist, down his pant leg, and onto the ground.  (*Id.* at 133.)  Petitioner picked it up and put it back in the front of his waistband.  (*Id.* at 133-34.)  The two continued to argue, and the gun fell again.  (*Id.* at 134.)  When Petitioner bent to pick it up again, Anderson also tried to pick up the gun.  (*Id.*)  Petitioner got hold of the gun, but when he attempted to straighten up, Anderson grabbed his hand.  (*Id.* at 135.)  The two struggled over the gun.  (*Id.*)  The gun was pointed down, and Anderson's hands encased Petitioner's.  Anderson tried

to wrench the gun from Petitioner's hand, and the gun discharged toward the ground. (*Id.* at 136.) The gun went off twice, startling both Petitioner and Anderson. They both froze for a moment. (*Id.* at 137.) They then resumed struggling and arguing, and Anderson would not let go of the gun. (*Id.* at 138.) Anderson had both hands on the gun, and Petitioner had one hand on the gun, using the other to push Anderson away. (*Id.*) Anderson eventually pushed Petitioner's hand into the air, where it was fully extended to the highest Anderson, who was shorter, could hold it. (*Id.* at 139-40.) Petitioner kept telling Anderson to let go, and Anderson released one hand from the gun to attempt to choke Petitioner. Petitioner managed to bring the gun down to his side and push Anderson away. (*Id.* at 140.) The two stopped struggling, but they continued to exchange words. (*Id.* at 141.) At this point, Jamaun made his way across the street toward the two. (*Id.* at 141-42.) Jamaun came diagonally across the street from where he was sitting on the church steps. (*Id.* at 142.) Jamaun attempted to lead Anderson away. (*Id.* at 142.) Anderson walked away backward, led by Jamaun. Petitioner did not know at this time that Anderson had been injured. (*Id.* at 143.) Petitioner placed the gun back in his waistband, turned to walk home, and heard someone call his name. He looked around and saw "Patrick" (Melvin Emmans), and Petitioner walked toward Emmans' car. (*Id.*) Emmans had just returned from the bar, and the two made small talk, and Petitioner asked Emmans for a drink. Emmans said, "Well, this is all I got." (*Id.* at 144.) Petitioner stated that he had some at his house, and Emmans asked where Petitioner was staying. Petitioner got into the passenger seat, and Emmans drove him toward Petitioner's house, saying that Petitioner would have to tell him how to get there. (*Id.* at 144-45.) As they drove, Petitioner opened the window and emptied the bullets out of the gun and out the window. He placed the gun on the floorboard, under the seat. (*Id.* at 145.) Petitioner stated that, though he did not know that Anderson was injured, he was afraid that someone

would report the shots, and he did not want the police to find him with a loaded gun.  (*Id.* at 148.)

Emmans turned his map light on and told Petitioner, "don't be leaving your shit in my car."  (*Id.* at

149.)  After they arrived at the house, they parked and got out, but the map light stayed on.  (*Id.*)

Because he was drunk, Emmans could not figure out why it was on, and he eventually decided to

leave it.  (*Id.* at 150.)  The two went upstairs to Petitioner's apartment.  Petitioner also was

intoxicated.  (*Id.*)  He took his keys out, but he could not get the door open.  He therefore pounded

on the door, though he ultimately managed to get the door open before anyone got up to open it.  (*Id.*

at 151.)  Petitioner laid his coat on the bar stool and laid the gun on top of the stool.  (*Id.* at 152.)

Petitioner showed Patrick to the living room and then went back to the bedroom he shared with

Hegler and had a brief conversation with him, mentioning that Emmans was at the house.  (*Id.* at

153.)  Petitioner and Emmans finished off the 40-ounce bottle of Colt 45 that Emmans had with him.

(*Id.* at 151-52.)

Petitioner testified that when Anderson told Hegler that he and Petitioner had a sexual

affair, it had not had a significant effect on Petitioner's relationship with Hegler, but the information

hurt Hegler's feelings, as Petitioner and Hegler had been together for eleven years.  (*Id.* at 153.)

Petitioner stated that he was "in the doghouse" because Hegler was upset.  (*Id.* at 154.)  Petitioner

stated that his argument with Anderson had not been so much about Anderson telling Hegler, but

about other things that came up.  (*Id.* at 154.)  When Petitioner was taken into custody on October

20, 1997, he knew only the charges, but no specific details.  (*Id.* at 154-55.)  He was informed that

Anderson had been shot, and he asked whether Anderson was alright.  (*Id.* at 156.)  On cross-

examination, Petitioner acknowledged that he had been arraigned by the time he spoke to Detective

Merlo and that he had been appraised of the charges.  (*Id.* at 157-58.)  Petitioner admitted that he had

placed the box of bullets in the safe.  He also identified the wallet and the blue pouch recovered by the police as his own, and he acknowledged that the pouch contained some bullets and that he had the pouch with him that evening.  (*Id.* at 160-62.)  Further, Petitioner admitted that his finger was on the trigger the entire time.  (*Id.* at 176.)

At the conclusion of trial, on April 10, 1998, the jury found Petitioner guilty of assault with intent to commit great bodily harm less than murder and felony firearm.  (Tr. IV at 5.)  On May 11, 1998, Petitioner was sentenced as a fourth felony offender to serve a prison term of 15 to 30 years for the GBH conviction and 2 years for the felony-firearm conviction.  (Sentencing Transcript, (S. Tr.) at 29, 31, docket #9.)

### B.       Direct Appeal

After trial, Petitioner waived appointment of counsel on appeal, indicating that he intended to retain his own appellate attorney.  On June 15, 1998, Petitioner, acting pro se, submitted a claim of appeal to the Michigan Department of Corrections to file by the June 22, 1998 deadline.  Prison officials neglected to mail the claim of appeal in a timely fashion, and it was not received by the Michigan Court of Appeals until four days after the deadline.  As a consequence, on September 2, 1998, the court of appeals rejected Petitioner's appeal of right.  Again acting pro se, Petitioner filed a Motion to Reinstate Appeal, arguing that he had been denied his right to appeal by the negligence of prison officials.  The court of appeals denied his request on May 10, 1999.  Petitioner filed a pro se application for delayed leave to appeal on May 10, 1999, raising seven grounds for relief.

     I.     The trial court committed reversible error in denying [Petitioner's] request for a lesser included cognate offense instruction.

- 22 -

II.   The trial court abused its sentencing discretion in sentencing [Petitioner] based upon inaccurate and unsubstantiated information in the PSIR.

III.   [Petitioner's] 15-30 year sentence for [the assault conviction] was not proportionate to either the offense or the offender and exceeds [Petitioner's] known life expectancy.

IV.   The IAD operates to prevent the trial court's reliance upon [Petitioner's] out-of-state conviction for sentence enhancement purposes.

V.   The prosecution engaged in prosecutorial misconduct that deprived [Petitioner] of a fair and impartial trial.

VI.   [Petitioner] was deprived of his constitutional right to effective assistance of counsel.

VII.   The cumulative effect of the trial court, prosecution, and trial counsel's errors deprived [Petitioner] of his constitutional right to a fair trial and sentencing.

(Pet. at 3-4, docket #1.)  On October 2, 2000, the court of appeals denied the application for lack of merit in the grounds presented. Petitioner then filed an application for leave to appeal in the Michigan Supreme Court, raising grounds I - VII, *supra*, as well as the following:

VIII.   Under [the] state and federal constitutions is [Petitioner] entitled to an appeal?

IX.   The Michigan Supreme Court should adopt the "Prison Mailbox Rule" set forth in *Houston v. Lack*.

(Pet. at 5-6, docket #1.)  On June 26, 2001, the supreme court ordered Petitioner's application to be held in abeyance pending the outcome of *People v. Cornell*, 646 N.W.2d 127 (Mich. 2002), and *People v. Silver*, 646 N.W.2d 150 (Mich. 2002).  After issuance of the two decisions, the Michigan Supreme Court denied Petitioner's application for leave to appeal on September 17, 2002.  (*See* 9/17/02 Mich. Ord., App. D to Mot. for New Trial, docket #13.)

### C.   Post-conviction relief

On September 16, 2003, Petitioner filed a motion for relief from judgment in state court raising *seventeen* grounds for relief, including the following:

- 23 -

VI.     Due process requires [Petitioner] to be sentenced based upon accurate
        information, under the state and federal constitutions and law.

                                    . . .

XV.     [Petitioner] was denied the effective assistance of counsel, depriving him of
        a fair and impartial trial and sentencing, and due process under the state and
        federal constitutions and law.

(Pet. at 11-12, docket #1.)[3]  The motion was denied on January 29, 2004, on the basis that Petitioner

was rearguing issues raised on direct appeal.  (*See* 1/29/04 Cir. Ct. Ord., App. F to Mot. for New

Trial, docket #13.)  Petitioner sought reconsideration, which was denied on March 4, 2004.  (*See*

3/4/04 Cir. Ct. Ord., App. G to Mot. for New Trial.)  Petitioner appealed the denial of his motion to

the Michigan Court of Appeals and to the Michigan Supreme Court, which denied leave to appeal

on August 17, 2005, and January 27, 2006, respectively, because Petitioner failed to meet the burden

of establishing entitlement to relief.  (*See* 8/17/05 MCOA Ord., App. H to Mot. for New Trial;

1/27/06 MSC Ord., App. I to Mot. for New Trial.)

### D.    First habeas petition

        Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in the

Eastern District of Michigan raising the following issues:

I.      In denying [Petitioner] an appeal, either by right or by leave, the State
        deprived him of his constitutional right to an appeal, equal protection of the
        law, and due process, under the state and federal constitutions and law.

II.     In denying a proper request for an appropriate instruction on a lesser included
        offense, the trial court abused its discretion, invaded the province of the jury,
        and deprived [Petitioner] of his constitutional right to present a defense, a fair

---

[3]The other fifteen grounds are identified in the petition.  (*See* docket #1, Page ID##11-12.)  I omit them here
because they are duplicative of issues raised on direct appeal and/or because they appear to be unrelated to the issues
raised in the instant petition.

and impartial trial, and due process under the state and federal constitutions and law.

III.    As retroactively applied to [Petitioner's] case, *People v. Cornell*, 646 N.W.2d 127 (Mich. 2002), violates the state and federal constitutions' prohibitions against ex post facto laws, and under the dictates of due process should not apply retroactively.

IV.    Due process requires [Petitioner] to be sentenced based upon accurate information, under the state and federal constitutions and law.

V.    [Petitioner's] 15-30 year sentence for assault with intent to do great bodily harm less than murder, Mich. Comp. Laws § 750.84, was not proportionate to the offense or offender, individualized, or proportionate to the sentences meted out to other offenders for the same or similar offenses, depriving him of his constitutional right to due process under the state and federal constitutions and law.

VI.    The prosecutor impermissibly engaged [Petitioner] in vouching for the credibility of the prosecution's witnesses, depriving him of his constitutional right to a fair and impartial trial, and due process under the state and federal constitutions and law.

VII.    The prosecutor impermissibly commented on [Petitioner's] exercise of his constitutional right to trial, to testify, and to present a defense, in requesting a 15-30 year sentence, depriving him of a fair and impartial sentencing, and due process under the state and federal constitutions and law, and giving rise to a presumption of vindictiveness in the 15-30 year sentence received.

VIII.    [Petitioner] was denied the effective assistance of counsel, depriving him of a fair and impartial trial and sentencing, and due process under the state and federal constitutions and law.

IX.    The cumulative effect of the trial court, prosecution, and counsel's errors, deprived [Petitioner] of a fair and impartial trial and sentencing, and due process under the state and federal constitutions and law, requiring reversal of his convictions, a new trial, and resentencing, to otherwise prevent a miscarriage of justice.

*Dorn v. Lafler*, No. 2:06-11993, 2008 WL 724365, at *2 (E.D. Mich. Mar 18, 2008). The district court denied the petition because Petitioner's claims were either procedurally defaulted or meritless.

- 25 -

*Id.* Petitioner moved the district court and the Sixth Circuit to grant a certificate of appealability with respect to issues I, II, III, IV and VIII of the petition, but a certificate was granted solely with respect to issues I (right to appeal) and VIII (right to effective assistance of counsel).

After review, the Sixth Circuit determined that the state had deprived Petitioner of his right to an appeal. It therefore reversed the district court's judgment and remanded the matter to the district court so that it could issue orders allowing Petitioner to obtain full appellate review in state court. *See Dorn v. Lafler*, 601 F.3d 439, 445 (6th Cir. 2010), *abrogated on other grounds in Harrington v. Richter*, 562 U.S. 86 (2011). The court reserved judgment on Petitioner's ineffective-assistance claim because the Michigan courts would have another opportunity to review it. *Dorn*, 601 F.3d at 445 n.4.

### E.    Second state-court appeal

After the Sixth Circuit's ruling, the state court appointed counsel for Petitioner, and counsel filed a motion for a new trial and an evidentiary hearing, raising four grounds:

1.    The state's inability to provide [Petitioner] with a speedy appeal violated his right to due process of the law.

2.    [Petitioner's] trial counsel was constitutionally ineffective where she failed to properly investigate, interview key witnesses, and object to the prosecutor's misconduct.

3.    The trial judge failed to properly instruct the jury . . . .

4.    The prosecution's conduct . . . deprived [Petitioner] of his due process right to a fair trial.

(Pet. at 25, docket #1.) The trial court denied the motions on October 7, 2010. (10/7/10 Cir. Ct. Ord., docket #13.)

- 26 -

Petitioner, through counsel, filed an appeal and a motion for remand raising the following issues:

I.   The trial judge improperly denied [Petitioner's] requested jury instruction, which deprived him of his constitutional rights to a properly instructed jury and to present a defense . . . .

II.   [The trial court's] reasons for denying [Petitioner's] motion . . . regarding the prosecutor's misconduct are unsupportable and legally insufficient . . . the prosecutor's misconduct deprived him of his due process right to a fair trial.

III.   [The trial court's] reasons for denying [Petitioner's] motion . . . regarding his claim of ineffective assistance of counsel are unsupportable and legally insufficient . . . because defense counsel's objectively unreasonable choices prejudiced him and deprived him of his due process right to a fair trial; in the alternative, [Petitioner] is entitled to an evidentiary hearing . . . regarding his ineffective assistance of counsel claim.

IV.   The twelve year delay in [Petitioner's] appeal . . . constitutes a denial of due process for which the only remedy is dismissal of his convictions.

(Pet. at 26-27, docket #1.)  Petitioner raised two additional issues in a *pro se* supplemental brief on appeal:

[V.]   [Petitioner] is entitled to be resentenced . . . because . . . the court considered inaccurate information [and] . . . constitutionally impermissible grounds in imposing [the] sentence[.]

[VI.]   [Petitioner's] conviction and sentence as a fourth habitual offender . . . must be vacated because . . . the facts of the [underlying] Oregon conviction do not support a felony in Michigan[, and] the information that the court relied on to enhance [Petitioner's] sentence is no longer valid.

(Pet. at 28-29, docket #1.)  In an unpublished opinion issued on October 13, 2011, the Michigan Court of Appeals rejected all appellate issues.  (10/13/2011 MCOA Op., docket #11.)  It also denied a motion for reconsideration on November 21, 2011.  (11/21/11 MCOA Ord., docket #11.)

- 27 -

Petitioner then sought leave to appeal to the Michigan Supreme Court, raising somewhat reworded issues I, III, IV, V and VI from his second direct appeal. The supreme court denied his application on May 21, 2012, because it was not persuaded that the questions presented should be reviewed by that court. (5/21/12 Mich. Ord., docket #12.)

### F.    Second habeas petition

Petitioner filed this, his second habeas petition, on or about August 16, 2012, raising the three grounds set forth at the beginning of this report and recommendation.

<u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

I.      <u>Ineffective Assistance of Counsel</u>

In his first ground for habeas relief, Petitioner contends that his trial counsel failed to investigate and call witnesses, who would have testified that Petitioner's long-term relationship with Steve Hegler was not harmed by Walter Anderson's revelation that Petitioner had a sexual encounter with Anderson.  Petitioner also contends that trial counsel failed to investigate materially untrue information in the presentence report that included an alleged Oregon conviction that was used to enhance Petitioner's sentence as a habitual offender.  In addition, Petitioner argues that his attorney provided ineffective assistance when she failed to object to the inaccurate information in the presentence report.

#### A.      Standard for Ineffective Assistance

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed

- 31 -

at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

## B.    Failure to investigate and call witnesses

Petitioner argues that his attorney was ineffective in failing to call Petitioner's partner, Steve Hegler, who purportedly would have corroborated Petitioner's testimony that his sexual tryst with Anderson did not cause Hegler to move out of the house or otherwise disrupt Petitioner's relationship with Hegler.  Two other witnesses, Troy Bowman and Frank McCone, allegedly would have further corroborated that testimony.  All three witnesses would have testified that Petitioner bore no animosity towards Anderson.  Further, the witnesses would have testified about Petitioner's actions earlier that evening, including his alcohol and drug consumption, which would have demonstrated that Petitioner did not form the specific intent required to prove GBH.  Finally,

Petitioner contends that Donald Cain could have testified that he was at the park that evening and that Anderson was the one who initiated a conversation with Petitioner, because Anderson was upset that Petitioner did not tell him about his HIV status.[4]

At a hearing on Petitioner's motion seeking a new trial, the trial court denied Petitioner's claim on the merits, as follows:

> THE COURT: . . . We're here on a motion for a new trial and a request for an evidentiary hearing. I don't think the appropriate result, given the record that we have at this point, is a dismissal. And I realize that there's a number of different alternative relief options for relief that the defendant is requesting. That's one of them, and I'm – I'm going to deny that request. I'll state that right off the bat.
>
> . . . I'm going to the arguments for ineffective assistance of counsel.
>
> . . .
>
> With regards to the witnesses that were not called, it's very clear from the record that the defendant was very involved in this case. I think you can pick that up

---

[4]In its 2011 decision following the Sixth Circuit's decision, the Michigan Court of Appeals held that Petitioner failed to establish the factual predicate for his claim of ineffective assistance of counsel in failing to call witnesses. (*See* MCOA Op. at 4.) Specifically, the court of appeals held that Petitioner had failed to present affidavits in support of his assertions at the hearing on the motion for new trial. The Michigan Supreme Court has on a number of occasions held that a motion for new trial is properly denied if the new evidence is based solely on hearsay, not affidavit. *See People v. Grissom*, 821 N.W.2d 50, 80 (Mich. 2012) (citing *People v. Borowski*, 47 N.W.2d 42, 46 (Mich. 1951) (holding that the affidavit of counsel cannot support granting a motion for new trial), and *People v. Martin*, 74 N.W. 653 (Mich. 1898) (same)); *Sylvester v. Grabowski*, 122 N.W.2d 707, 708 (Mich. 1963) (holding that the affidavits of the plaintiff and their counsel are hearsay and do not form a proper basis for an order for new trial). Arguably, therefore, Petitioner's claim should be considered procedurally defaulted. "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review." *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010). Nevertheless, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson*, 351 F.3d at 215-16 (6th Cir. 2003); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

from the transcript that there's a lot of conversations back and forth between he and his counsel.

There's a representation that Mr. Hegler was here throughout the trial. I have no reason, based on this record, to conclude that – or reach the conclusion that Ms. Shirley wasn't aware of what he could have testified to. For whatever reason, the decision was made, it appears, for him not to testify.

I don't find that that's ineffective assistance of counsel under the circumstances. Again, I can certainly see that there's reasons that she may have wanted him to and – And many times that is the case; that there are – There's testimony that witnesses can give that would be helpful; but it could also be very damaging, depending on what information is out there.

We've addressed some of those today. The prosecuting attorney brought up for example – And, again, this is a conclusion. I realize that. It's an assumption[] – maybe he wouldn't – it wouldn't be good to have him testify because charges could be brought against him.

And I'm not saying that that's the reason; I'm just saying that there are reasons why attorneys don't call witnesses that may be helpful for some reasons and, again, might be damaging for other reasons.

I don't have any reason, based on the record, based on the fact that there's comments made about some of these witnesses during the preliminary examination, that causes the Court to believe that she was certainly aware of these witnesses and that a conscious decision was made not to call them for whatever reason.

I can certainly understand the defendant's decision that if these witnesses testified exactly like the defense is indicating or presenting that they would testify, it may bolster defendant's – it may have bolstered defendant's credibility. It may have done some damage to the – put some question in the mind of the jurors. I understand that.

But there's always two sides to the story. And, again, based on the record and the fact that these witnesses were identified and addressed by Ms. Shirley at different times, I can't find that she completely ignored that information. I don't see any information that she didn't investigate that or – or that it was anything other than a conscious decision not to call those witnesses.

And, again, I'll reiterate it's – I'm not going to – I'm not here to be a Monday morning quarterback. But the decision was made, and I don't find that it was an

unreasonable decision that any other – or some other reasonable defense attorney would have made or wouldn't have made.

. . .

So I guess all in all, based on all those rulings or my findings, I'm not going to grant a *Ginther*[5] hearing; I'm not going to grant defendant's motion for new trial based on the reasons outline on the record.

(*Id.* at 49-54, docket #10.)

Petitioner argues that the trial court erred in finding that counsel's decision not to introduce the testimony of Hegler, Bowman, McCone and Cain was strategic. Instead, Petitioner characterizes defense counsel's failure to introduce the evidence as a failure to investigate, which, he argues, should not be entitled to the presumption that counsel's decision was strategic.

It is well established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)

---

[5]*People v. Ginther*, 212 NW2d 922 (Mich. 1973) (requiring that, where the basis for a claim of ineffective assistance of trial counsel depends on facts outside the record, the defendant is responsible for seeking an evidentiary hearing in the trial court to make a testimonial record).

(cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).  In *Wiggins v. Smith*, 539 U.S. 510, 524-29 (2003), the Supreme Court held that the petitioner was entitled to a writ of habeas corpus because his counsel had failed to conduct a reasonable investigation into potentially mitigating evidence with respect to sentencing.  *Id.*  According to the Court, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentence strategy impossible."  *Id.* at 527-28; *see also Towns*, 395 F.3d at 258-59 (holding that defense counsel's failure to investigate potentially important witness in robbery and felony murder trial was unreasonable); *Combs*, 205 F.3d at 287-88 (holding that defense counsel was constitutionally ineffective for failing to investigate adequately his own expert witness); *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992) (holding that counsel was constitutionally ineffective for failing to conduct an investigation into certain physical evidence that would have undermined the prosecution's theory).

In support of his argument that counsel failed to investigate, Petitioner proffered Hegler's statement that the attorney never asked him how Petitioner's infidelity with Anderson had affected their relationship.  On the basis of Hegler's affidavit and similar statements from Bowman set forth in a letter sent to the court before sentencing, Petitioner suggests that counsel's decision not to introduce Hegler's evidence should not be given deference, because, without asking Hegler, a "fully informed decision with respect to strategy [was] impossible."  *Wiggins*, 539 U.S. at 527-28.

As the trial court recognized, it was apparent from the record that counsel was fully aware of at least Hegler and Bowman as supportive witnesses for Petitioner.  Defense counsel introduced both Hegler and Bowman at the preliminary hearing, indicating that they were there to support Petitioner.  (Prelim. Hr'g Tr. at 14, docket #24.)  In addition, the prosecutor represented, and

- 36 -

Petitioner did not dispute, that Hegler was present during the whole trial, undermining any assumption that defense counsel was unaware of Hegler's ability to corroborate Petitioner's evidence. (Tr. of Hr'g on Mot. for New Trial at 21.) Further, because Frank McCone originally was listed on the list of witnesses the prosecution intended to call at trial, defense counsel clearly knew of McCone as a possible witness. (Tr. I at 9.) As a result, the trial court reasonably concluded that defense counsel was fully aware of these proposed witnesses. In fact, in his motion for new trial, Petitioner represented that Hegler had notified defense counsel that he was willing to testify that Petitioner's infidelity with Anderson did not cause a disruption in Hegler's relationship with Petitioner. (*See* Mot. for New Trial at 6, docket #13.) Yet defense counsel expressly stated on the record that she did not intend to call Hegler. (Tr. I at 11.) On these facts, no basis exists for concluding that counsel's decision not to introduce the testimony of Hegler, Bowman and McCone was the result of anything other than trial strategy.

Other facts support this conclusion. The trial transcript indicates that Petitioner frequently consulted with his attorney during trial, and on more than one occasion defense counsel placed issues on the record that Petitioner had specifically requested. In addition, as the trial court was aware, the proffered statements of Hegler, Bowman and McCone were particularly convenient and untestable, given that no affidavits were presented and the trial attorney was no longer alive. Indeed, Hegler only swore out his affidavit on February 18, 2011, more than a decade after Petitioner was convicted. (*See* Hegler Aff., docket #11.) Further, as the prosecutor noted, defense counsel had at least one good reason not to call Hegler. Hegler had himself obtained the handgun and given it to Petitioner, which would have presented a fertile basis for cross-examination and could possibly have exposed Hegler to prosecution. (Tr. of Hr'g on Mot. for New Trial at 20-21.) Moreover,

because Petitioner acknowledged that his infidelity had caused him to be "in the doghouse" (Tr. III at 151), Hegler could not credibly have testified that the infidelity had no effect on the relationship; he could only have disputed the seriousness of that effect and whether he had moved out because of it.  Similarly, the fact that Bowman and McCone could have testified that they were at a cordial gathering at Petitioner's residence with Petitioner and Hegler on the day of the shooting, while not irrelevant, would have done little to undermine the prosecution's theory of the case.[6]  Moreover, because Bowman was dead by the time of the motion for new trial, any allegation about what he could have said was wholly unsupported and ultimately unsupportable.  And McCone has at no time signed an affidavit substantiating his alleged testimony.  Finally, Petitioner's claim must fail because, although in possession of his deceased trial attorney's file, Petitioner refused to waive his attorney-client privilege with respect to the file.  As a result, the best information available concerning defense counsel's preparation, investigation, and discussion with Petitioner was kept from the trial court.

In sum, Petitioner's claim that counsel failed to investigate exculpatory witnesses conflicts with the evidence that counsel was fully informed about the witnesses.  As the trial court held, the decision not to call Hegler, Bowman and McCone resulted not from a failure of investigation, but from a decision by counsel that is presumed to be strategic.  Petitioner wholly fails to overcome that presumption or to overcome the double deference accorded the state-court's determination of his claim of ineffective assistance of counsel.

---

[6]Petitioner also argues that Frank McCone also could have contested McCree's testimony that he was talking to McCone in the park when he first saw Petitioner.  McCone's testimony would not have impeached McCree in any meaningful way.  McCree testified only, "Um, I think it was my friend, Frank." (Tr. II at 230.)  McCree expressed his uncertainty, and he identified the man he was talking to only as "Frank."  As a consequence, McCone's testimony that he was not present in the park would only have been marginally relevant, and it would not have undermined the substance of McCree's testimony.  Defense counsel acted reasonably in deciding not to call McCone on such a tangential issue.

Petitioner's argument concerning Mr. Cain's testimony is somewhat different. Petitioner contends that Cain could have testified that Anderson was looking for Petitioner and was angry that Petitioner had not informed him of his HIV status. Like McCone, Cain has never signed an affidavit, and no evidence exists from which to conclude that Cain actually would have provided the proffered testimony. Moreover, even if Cain testified as represented, Petitioner cannot demonstrate that counsel was ineffective.

In analyzing the failure to introduce evidence about Petitioner's HIV status as a reason why Anderson might have been the aggressor, the trial court held as follows:

> Likewise, with the issue of HIV. That was clearly placed on the record. It was clearly something that both counsel, I guess, agreed would be prejudicial. In fact, the transcript, I think the judge – At that point when he was addressing it initially, Judge Lamb didn't really know if it would be relevant or not; but the parties indicated on the record that they were not going to mention that or bring it up, and it was found to be prejudicial.

> And I think I can take judicial notice of the fact that 12 years ago that issue was more hotly debated and – and it certainly prejudiced a jury more so than I think it would today. So I think it was logical that an attorney might decide not to make that argument in this case. And I don't think that it was ineffective assistance of counsel or something that any – I think it's something any reasonable attorney back then would have decided.

(Tr. of Hr'g on Mot. for New Trial at 49-50.) Using a similar analysis, the Michigan Court of Appeals reached the same conclusion:

> Defendant next argues defense counsel was ineffective for failing to fashion a defense around defendant's HIV-positive status. According to defendant, counsel should have presented evidence that the victim was angry at defendant for not disclosing his HIV-positive status before defendant had a sexual relationship with the victim. Defendant argues that if the jury would have known that the victim had a reason to be upset with defendant, it likely would have believed defendant's testimony that the victim was the aggressor. Defense counsel's decisions regarding which theories to argue at trial and what evidence to present are matters of trial strategy that this Court will not second-guess with the benefit of hindsight. *People*

*v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).  We find that defense counsel's decision to omit any reference to defendant's medical condition constituted reasonable trial strategy.  Although additional information providing a motive for the victim's aggression may have bolstered defendant's theory that the victim was the aggressor, the admission of evidence of defendant's HIV status carried a significant potential for prejudice.  The evidence would have portrayed defendant in a bad light because defendant would be admitting both criminal and deceitful conduct if he knew he was HIV positive and engaged in sexual penetration with the victim without first informing the victim of his medical condition.  MCL 333.5210.  Defense counsel's decision to keep this information from the jury was reasonable under these circumstances.

(10/13/11 MCOA Op. at 4.)

The determinations reached by the state courts were patently reasonable.  It is apparent from the record that defense counsel considered and decided against using any evidence related to Petitioner's HIV status.  At the beginning of the trial, defense counsel raised the issue of Petitioner's HIV status and requested a court order that no witness mention Petitioner's HIV status.  (Tr. I at 3-5.)  Defense counsel clearly had concluded that any mention of Petitioner's HIV status would be harmful to Petitioner's case, both because of the stigma associated with HIV infection and because of the negative light in which Petitioner would be painted for having failed to reveal his HIV status to a sexual partner.  Whatever Mr. Cain might have said that would have advantaged Petitioner, it would be offset by the potential prejudice caused by mention that Petitioner was HIV-positive.  Petitioner fails to overcome the double deference owed to the state court's determination that the attorney's judgment was reasonable.

### C.    Failure to defend on the basis of intoxication

Plaintiff contends that Hegler, McCone, and Bowman also could have testified that they were with Petitioner on the day and evening of October 19, 1997, celebrating Hegler's birthday.  According to Petitioner, the witnesses could have testified to his degree of intoxication until he left

- 40 -

the party at approximately midnight. As a consequence, they could advanced intoxication as a defense to the specific intent require to prove GBH.

In addressing the claim, the Michigan Court of Appeals held as follows:

Defendant also argues defense counsel should have asserted a voluntary intoxication defense to negate the specific intent element of assault with intent to commit murder or assault with intent to do great bodily harm. At the time of defendant's trial, voluntary intoxication was a permissible defense. But intoxication only provided a defense if the facts of the case could allow the jury to conclude that the defendant's intoxication was so great that the defendant was unable to form the necessary intent. *People v Mills*, 450 Mich 61, 82; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995). Defendant's testimony regarding the events of the night was detailed and specific. Moreover, the testimony of the various witnesses supports a conclusion that a voluntary intoxication defense was not viable. Indeed, the record is devoid of any evidence from which it may be inferred that defendant was so intoxicated that he could not form the necessary intent. Thus, defense counsel was not ineffective for failing to advance the theory of voluntary intoxication because counsel does not have an obligation to make meritless arguments. *People v Darden*, 230 Mich App 597, 605; 585 NW2d 27 (1998).

(MCOA Op. at 5.)

The court of appeals' determination is entirely reasonable. Inasmuch as McCone never submitted an affidavit concerning Petitioner's extreme intoxication, the record contains only the affidavits of Petitioner and Hegler (which were not submitted until Petitioner moved for reconsideration in the Michigan Court of Appeals from the denial of the motion to remand) and Petitioner's sworn testimony at trial. Petitioner's testimony at trial only briefly referred to being intoxicated, and then only in a minimizing capacity in comparison to Emmans. (Tr. III at 150 (noting that Emmans was "highly intoxicated" while Petitioner was merely "intoxicated").) In contrast, in their affidavits, Petitioner and Hegler stated that Petitioner had consumed both Xanax and Vicodin and had drunk alcohol on the evening of the incident, in celebration of Hegler's birthday. Plaintiff alleges that he told counsel that, in addition to consuming the pills, he had drunk a fifth of Seagram's

gin, together with schnapps, vodka, a 40-ounce beer and an alcoholic beverage named "Orange Dream." (2/23/11 Aff. of Pet'r, docket #11.)  Petitioner's trial testimony, however, was replete with evidence belying intoxication so severe that he could not form the requisite intent:  he testified in detail about every aspect of his argument with Anderson and the precise movements leading up to the shooting; he testified that he had the presence of mind to empty the action of the revolver for fear of being caught with a loaded weapon; he testified that he knew why the light remained on in Emmans' car, though Emmans was too drunk to be aware; he testified precisely where he placed his coat and gun when he entered his house; and he testified to the brand of the alcohol that he and Emmans drank at his house when they returned.  The substance and detail of Petitioner's testimony undermined any conclusion that his intoxication was so extreme that it prevented him from forming the intent required to prove the offense.  The affidavits submitted by Petitioner and Hegler more than ten years later cannot create a question belied by Petitioner's trial testimony.

Further, Hegler and McCone could only testify about Petitioner's intoxication before midnight, as Petitioner did not go to the bar with them.  Hegler and McCone therefore could not testify to Petitioner's intoxication more than two hours later, at the time Petitioner discharged his weapon.  In the face of Petitioner's lucid trial testimony, evidence provided by other witnesses about his intoxication would have been unavailing.

Because Petitioner's own testimony undermined a conclusion that intoxication prevented him from forming the requisite intent, counsel was not ineffective for failing to raise the defense or to introduce the evidence of Petitioner and McCone to testify that Petitioner had mixed alcoholic beverages and pain pills earlier that evening.  Petitioner falls far short of overcoming the deference owed to the state-court's rejection of his claim.

### D.       Failure to investigate the Oregon felony

Petitioner argues that his trial attorney was ineffective in failing to investigate his Oregon conviction for unauthorized use of an automobile in 1991.  Petitioner asserts that the conviction was for a misdemeanor, rather than a felony.  Because the conviction was one of the three predicate offenses used to sentence him as a fourth felony offender, Petitioner contends that he was sentenced based on inaccurate information, in violation of his right to due process.  He asserts that trial counsel was ineffective in failing to investigate the charge prior to sentencing.

Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.  *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.  *Duncan*, 513 U.S. at 365-66; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845.

Petitioner raises this claim of ineffective assistance for the first time in his habeas brief.  In the state appellate courts, Petitioner contended only that he was sentenced based on

inaccurate information in a number of respects.  He did not argue that counsel was ineffective for failing to raise the issue.

Because Petitioner failed to exhaust this claim of ineffective assistance of counsel in the state courts, and because he has no remaining available state-court remedies, his claim is procedurally defaulted.  *See Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991); *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  If a petitioner has procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

In order to show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal.  *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  A petitioner who fails to demonstrate cause and prejudice cannot have a cognizable claim.  *Gray*, 518 U.S. at 162.  Where a petitioner fails to show cause, the court need not consider

whether he has established prejudice.  *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Petitioner fails entirely to establish cause excusing his default.  Moreover, even appellate counsel's failure to raise the issue would not relieve him from his default.  To serve as cause to excuse the default, a claim of ineffective assistance of appellate counsel must itself be properly exhausted.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).  Because Petitioner did not exhaust a claim of ineffective assistance of appellate counsel in the state courts, he cannot demonstrate the requisite cause excusing his default of the underlying claim of ineffective assistance of trial counsel.  Further, Petitioner fails entirely to demonstrate any new reliable evidence showing that he is actually innocent within the meaning of *Schlup*, 513 U.S. at 327.  Petitioner's default of his claim therefore precludes habeas relief on his claim that counsel was ineffective in failing to challenge the Oregon felony.

## II.    Sentence Based on Inaccurate Information

In his second ground for habeas relief, Petitioner contends that he was sentenced on a variety of inaccurate information.  First, he alleges that his sentence was enhanced based on an alleged felony conviction in Oregon for the unlawful driving away of an automobile.  Second, he alleges that the presentence investigation report (PSIR) included inaccuracies about his having left a juvenile placement without permission, about the number of his parole violations, and about his having two convictions, rather than one, for resisting and obstructing a police officer.

- 45 -

### A.    Oregon conviction

The court of appeals rejected Petitioner's argument concerning the Oregon conviction because Petitioner had failed to lodge a contemporaneous objection:

> Finally, defendant argues that he should not have been sentenced as a fourth offender, MCL 769.12, because one of the convictions the trial court relied on for defendant's habitual offender status is not a valid conviction.  But defendant did not challenge the conviction in the trial court; therefore, this claim is not properly preserved for appellate review.  Defendant does not highlight any evidence contained in the record to support his assertion that he does not actually have the required predicate convictions to be sentenced under MCL 769.12.  The presentence investigation report indicates defendant had three previous felony convictions, and on the record before this Court defendant has failed to demonstrate plain error affecting his substantial rights.  *Carines*, 460 at 763.  Defendant is not entitled to resentencing.

(MCOA Op. at 6.)  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee v. Kemna*, 534 U.S. 362, 385 (2002).  Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011; *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010); *Lancaster*, 324 F.3d at 437 (6th Cir. 2003); *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

Petitioner therefore must show cause and prejudice excusing his default or actual innocence.  *See House*, 547 U.S. at 536.  As I previously discussed, Petitioner did not contend in the state courts that trial counsel was ineffective for failing to challenge the Oregon conviction.  Because

he did not exhaust his claim of ineffective assistance of counsel on this issue, he cannot demonstrate cause excusing his default.

Moreover, even if his claim were not defaulted, it would fail as a factual matter. A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447; *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984). A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 447.

In addition to holding that Petitioner had failed to lodge a contemporaneous objection, the Michigan Court of Appeals held that Petitioner had failed to substantiate his assertion that he did not have the requisite predicate convictions to be sentenced under MICH. COMP. LAWS § 769.12. (*See* MCOA Op. at 6.) That decision was patently reasonable. The prosecution attached the Oregon judgment to its brief on appeal to the Michigan Court of Appeals. (*See* Or. J., Attach. B. to Br. of Appellee, docket #11.) That judgment, dated July 10, 1991, clearly states that Petitioner pleaded guilty to the offense of unauthorized use of a motor vehicle, for which Petitioner was sentenced to 30 days in jail, with credit for time served, and 18 months' probation, together with payment of costs and restitution. (*Id.*) The Oregon statute under which Petitioner was sentenced states that the offense is classified as a Class C felony. *See* Or. Rev. Stat. § 164.135. Under Oregon law, a Class

C felony may be punished by a maximum prison term of five years.  *See* Or. Rev. Stat. § 161.605(3).

The Oregon statute proscribes conduct akin to that proscribed under MICH. COMP. LAWS § 750.414,

which punishes the use of a motor vehicle without authority but without intent to steal.  Although

the Michigan offense is described as a misdemeanor, it is punishable for up to two years'

imprisonment.  *Id.*  Any offense punishable by more than one year may be counted as a felony for

purposes of the Michigan habitual offender statutes.  *See People v. Smith*, 378 N.W.2d 384, 392-93

(Mich. 1985) (holding that two-year misdemeanors may be considered as felonies for a variety of

purposes, including the habitual-offender laws).

        As a consequence, based on the Oregon judgment, the sentencing court in the instant

case properly counted the Oregon conviction in determining that Petitioner was a fourth felony

offender.  Petitioner utterly failed to demonstrate in the state courts that the copy of the judgment

was false or inaccurate at the time he was sentenced.[7]  Therefore, even if Petitioner's procedural

default were excused, he failed entirely to demonstrate that he was sentenced on the basis of

misinformation of a constitutional magnitude.  *See Roberts*, 445 U.S. at 556; *Tucker*, 404 U.S. at

447.

---

[7]Petitioner suggests that his Oregon conviction was ultimately dismissed in 2000, and that the conviction therefore was not valid.  He attached to his supplemental brief on appeal to the Michigan Court of Appeals a copy of an order of the Oregon court dismissing the pending action against Petitioner on April 14, 2000.  (*See* 4/14/00 Or. Ord., Attach. to Appellant's Supp. Br. on Appeal, docket #11.)  It is not at all apparent that the order dismissed his conviction; rather, the order appeared to dismiss the reopened Oregon case and the outstanding warrant, after Petitioner violated his probation.  The dismissal was expressly based on the fact that Petitioner had since been incarcerated in Michigan for 17 to 30 years on the instant offenses and that further prosecution by the Oregon court therefore would not be in the best interest of justice.  (*Id.*)  Regardless, any decision by the Oregon court in 2000 did not cause the 1998 sentencing decision to be inaccurate.  At the time he was sentenced, Petitioner unquestionably stood convicted by an Oregon court of a felony offense.

## B.     Inaccurate information in the PSIR

Petitioner next asserts that, contrary to the presentence report, he was never absent without leave (AWOL) from a juvenile placement, and he denies that he had as many adult probation violations as were listed in the presentence report.  He also disputes that he had more than one assault-and-battery convictions and resisting-and-obstructing convictions.

Petitioner raised the claims at sentencing and on appeal in the state courts.  The trial court addressed the issues as follows:

> In his Standard 4 brief, defendant raises several challenges to his sentence and the accuracy of the contents of his presentence investigation report (PSIR).  We find that none of defendant's claimed inaccuracies necessitate a remand for the correction of the PSIR or resentencing.
>
> Defendant asserts that the trial court erred when it failed to strike as inaccurate the statement that defendant was AWOL from a halfway house on January 8, 1989.  The record reveals that defendant was in jail on that date, which established that defendant was absent without permission from the halfway house.  Thus, the trial court did not abuse its discretion when it determined that the statement was accurate and should remain in the PSIR.  *People v Uphaus (On Remand)*, 278 Mich App 174, 181; 748 NW2d 899 (2006).
>
> Defendant also asserts that the PSIR inaccurately indicates that he has two convictions for resisting and obstructing a police officer. According to defendant, he has only one such conviction.  The trial court expressly stated on the record that it would attribute only one such conviction to defendant, for purposes of sentencing. A failure to strike disregarded information can be harmless.  *People v Fisher*, 442 Mich 560, 567 n 4; 503 NW2d 50 (1993).  Here, defendant has not shown that the error caused him any adverse sentencing consequence.  Thus, any failure to strike is harmless, especially where the existing record does not contain any information confirming defendant's claim of an inaccuracy.

(MCOA Op. at 6.)

As the state court held, Petitioner fails to demonstrate either that the information about his being AWOL from a juvenile placement and having been convicted of two resisting-and-

- 49 -

obstructing convictions was materially false or that the trial court relied on the information in setting the sentence. *See Roberts*, 445 U.S. at 556; *Tucker*, 404 U.S. at 447.  With respect to being AWOL from his juvenile placement, Petitioner has never truly disputed that he was not present at his juvenile placement as required; he contends, as he did at the time of sentencing, that he was in jail, not voluntarily absent.  The trial court held and the court of appeals concluded that, regardless of the reason for Petitioner's absence, the statement in the presentence report to the effect that Petitioner was AWOL from his juvenile placement was accurate.

As the Sixth Circuit repeatedly has recognized, "'a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)).  Because the state courts determined that the reason for Petitioner being AWOL was legally irrelevant under Michigan law, this Court has no authority to grant habeas relief on the question.  Moreover, the decision of the state courts was patently correct as a matter of fact.  Petitioner does not dispute the underlying factual finding that he was not at his juvenile placement, he merely asserts that, in light of the reason for his absence, the statement to be removed.  Petitioner's argument is meritless.  The PSIR was factually correct.  Petitioner identifies no United States Supreme Court holding that requires a state to remove a factually correct statement from the sentencing report.

Moreover, Petitioner does not even attempt to show that the information had an effect on his sentence.  Petitioner has provided no evidence that the PSIR recorded his absence from the juvenile facility as an adjudication on which the sentencing court relied.  Further, the state provided evidence that Petitioner was AWOL three days before he landed in jail, and Petitioner has never

disputed that evidence. Petitioner therefore fails to demonstrate that any inaccuracy was material to his sentence or that the court relied on any misinformation in setting the sentence. As a consequence, Petitioner fails to demonstrate any component of the constitutional standard. *See Roberts*, 445 U.S. at 556; *Tucker*, 404 U.S. at 447.

Petitioner's complaint regarding the resisting-and-obstructing offenses is equally meritless. The trial court expressly held that it would attribute only one such conviction for purposes of sentencing. The court further ruled that the second offense would be stricken from the PSIR, unless the prosecutor presented documentation of the second conviction in which the Petitioner was represented by counsel. (S. Tr. at 12-14.) As a consequence, even if Petitioner could prove that the information was inaccurate, he cannot demonstrate that the trial court considered the second resisting-and-obstructing offense in setting the sentence. He therefore fails to demonstrate the second prong of *Tucker*, 404 U.S. at 447.

In sum, the state-court's determinations on Petitioner's sentencing claims were neither contrary to nor an unreasonable determination of clearly established Supreme Court precedent.

III.    Speedy Appeal

Petitioner contends that he was denied his right to a speedy appeal, in violation of the Michigan Constitution, statutes and rules. In addition, he suggests that the 12-year delay in receiving his appeal of right violated his right to due process, warranting an unconditional grant of habeas corpus.

The Michigan Court of Appeals rejected his claim as follows:

Defendant also argues that the 12-year delay between his conviction and sentencing and this Court's entertaining this appeal deprived him of due process and entitles him to the vacation of his convictions and sentences. Alternatively,

- 51 -

defendant requests that this Court either vacate his conviction and remand for entry of a conviction of careless, reckless, or negligent discharge of a firearm, or grant defendant a new trial, or remand for an evidentiary hearing.  Defendant's claim of a due process violation lacks merit.  Delay in appellate review violates due process only if the delay prejudices the defendant.  *People v McNamee*, 67 Mich App 198, 205; 240 NW2d 758 (1976).  Defendant suffered no prejudice where the record evidence supported his conviction, and the delay did not adversely affect his grounds for appeal or our ability to assess the merits of those grounds.[4]  *United States v Smith*, 94 F3d 204, 207-212 (CA 6, 1996).

> 4 Moreover, this Court reviewed and denied defendant's discretionary appeal "for lack of merit in the grounds presented." (Docket No. 219394; October 2, 2000), lv den 467 Mich 871 (2002).  Subsequently, on August 16, 2005, this Court entered an order denying defendant's application for leave to appeal the trial court's denial of defendant's motion for relief from judgment (Docket No. 260 553), lv den 474 Mich 1020 (2006).  Defendant "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *Id.*  See *Dorn v. Lafler*, 601 F3d at 442.

(MCOA Op. at 5 & n.4.)

The state-court's decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.  First, to the extent that Petitioner seeks relief under the Michigan Constitution and Michigan statutes or rules, his claim is not cognizable on habeas review.  "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (quoting 28 U.S.C. § 2254(a)).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'"  *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES).  The federal courts have no power to intervene on the basis of a perceived error of state law.  *Wilson*, 131 S. Ct. at 14; *Bradshaw*, 546 U.S. at 76; *Estelle v. McGuire*, 502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Second, the United States Supreme Court has never held that a criminal defendant has a federal constitutional right to a speedy appeal.  *See Turner v. Bagley*, 401 F.3d 718, 728 (6th Cir. 2005) (Guy, J. concurring in part and dissenting in part); *see also Hayes v. Ayers*, 632 F.3d 500,

523 (9th Cir. 2011) (holding that "no clearly established Federal law, as determined by the Supreme Court of the United States, recognizes a due process right to a speedy appeal"). In the absence of clearly established Supreme Court precedent, Petitioner cannot show entitlement to relief on his speedy-appeal claim.

Finally, even if Petitioner could show that he had a clearly established right to a speedy appeal, he would not be entitled to relief in this action, as his 1999 application for leave to appeal received a merits review, notwithstanding the Sixth Circuit's decision in *Dorn*, 601 F.3d 439. As the Sixth Circuit has since recognized in *Werth v. Bell*, 692 F.3d 486, 492-93 (6th Cir. 2012), *Dorn*'s holding that a summary denial of an application for leave to appeal is not a merits-based decision was abrogated by *Harrington v. Richter*, 562 U.S. at 99. As a result, it is apparent that Petitioner received merits-based appellate review of his conviction on October 2, 2000, only two years after his sentenced was imposed. As a consequence, as a purely factual matter, he cannot demonstrate unreasonable delay in appellate review.

For all these reasons, Petitioner's third habeas ground is without merit.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date:  July 13, 2015                           /s/ Ellen S. Carmody
                                               ELLEN S. CARMODY
                                               United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).